UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID KRITZELL, CINDY KRITZELL and A.K., by his parent and natural guardian, DAVID KRITZELL, <br><br>                 Plaintiffs, <br>   v. <br><br><br> HUTCHINSON INDUSTRIES, INC. and ANDY BARKER, <br><br>                Defendants. | **COMPLAINT AND DEMAND FOR JURY TRIAL** <br><br> DOCKET NO.: _____ <br><br> **CIVIL ACTION** |

Plaintiffs, David Kritzell, Cindy Kritzell and A.K., by their attorneys, Kiam & Abraham, LLC, complaining of the Defendants, Hutchinson Industries, Inc. and Andy Barker, allege as follows:

**PRELIMINARY STATEMENT**

1. The parties to this action are:

David Kritzell
1001 Hill Avenue, Apt. 2840
Wyomissing, PA 19610

Cindy Kritzell
1001 Hill Avenue, Apt. 2840
Wyomissing, PA 19610

A.K.
1001 Hill Avenue, Apt. 2840
Wyomissing, PA 19610

Hutchinson Industries, Inc.
460 Southard Street
Trenton, NJ 08638

1

Andy Barker
Hutchinson Industries, Inc.
460 Southard Street
Trenton, NJ 08638

2.  This is an action brought by Plaintiff David Kritzell against his former employer,

Defendant Hutchinson Industries, Inc. ("Hutchinson"), and his former direct supervisor,

Defendant Andy Barker.  Plaintiffs seek a judgment of this Court against Defendants for relief

under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C.

§ 1001, *et. seq.*  Specifically, Plaintiffs bring this action to collect damages and penalties

assessed under ERISA § 502(c)(1)(A) for Hutchinson's failure to abide by the Consolidated

Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1132(c)(1)(A).  Plaintiff

David Kritzell also seeks relief permitted under the New Jersey Conscientious Employee

Protection Act ("CEPA"), N.J.S.A. 34:19-1, *et seq.*, which prohibits an employer from retaliating

against an employee who reports an activity that the employee reasonably believes is in violation

of a law, rule or regulation promulgated pursuant to law or involves deception of the company's

shareholders or investors, or is incompatible with public policy.  Relief is also sought based on

claims of breach of contract, breach of the covenant of good faith and fair dealing, defamation,

tortious interference with prospective contractual relations, and intentional and negligent

infliction of emotional distress.

## PARTIES

3.  Plaintiff David Kritzell now, and at all times mentioned in this complaint, is a resident of

Pennsylvania.  Prior to his unlawful termination, David Kritzell was a former high-level

executive officer of Defendant Hutchinson.

4.  Plaintiff Cindy Kritzell now, and at all times mentioned in this complaint, is a resident of

2

Pennsylvania.  Plaintiff Cindy Kritzell is the spouse of David Kritzell.

5.  Plaintiff A.K. now, and at all times mentioned in this complaint, is a resident of Pennsylvania.  Plaintiff A.K. is the minor and dependent child of David and Cindy Kritzell.

6.  Defendant Hutchinson now, and at all times mentioned in this complaint, is a corporation duly organized and existing under the laws of Delaware, with its principal place of business in Trenton, New Jersey.  Hutchinson manufactures mobility components for wheeled vehicles. The company is a defense contractor, serving both original equipment manufacturers and the United States Defense Logistics Agency.  Eighty-five (85%) of its revenue comes from government contracts.  Hutchinson is a wholly-owned subsidiary of Hutchinson, S.A., a corporation duly organized under the laws of the country of France, with its principal place of business at 2 Rue Balzac, Paris, 75008, France.  Hutchinson, S.A. is a wholly-owned subsidiary of the oil producer, Total S.A. ("Total"), a public company traded on various exchanges, including the New York Stock Exchange, the London Stock Exchange, the Euronext Paris and the Euronext Brussels.

7.  Defendant Hutchinson was, at all times relevant hereto, David Kritzell's "employer" within the definition of CEPA.

8.  Defendant Andy Barker is the Chief Executive Officer ("CEO") and President of Hutchinson and a resident of Philadelphia, Pennsylvania.  Andy Barker was David Kritzell's direct supervisor at Hutchinson since in or around late 2015.

9.  Defendant Andy Barker was, at all times relevant hereto, David Kritzell's "employer" within the definition of CEPA, and was vested with actual and/or apparent authority over David Kritzell with the power to affect the terms and conditions of his employment.

**JURISDICTION AND VENUE**

10. Jurisdiction is proper pursuant to 29 U.S.C. § 1132(e)(1) and (f).  In addition, this action

may be brought before this court pursuant to 28 U.S.C. § 1331, which gives the district court jurisdiction over actions that arise under the laws of the United States.  Jurisdiction over the state law claims exists pursuant to 28 U.S.C. § 1367.

11.  Jurisdiction is properly laid in this court as the harms and obligations sued on occurred in New Jersey, where David Kritzell was employed prior to his termination and where all Defendants are doing business.

12.  Under ERISA, venue is proper where (1) the Plan is administered, (2) the breach took place, or (2) where any defendant resides or may be found, 29 U.S.C. § 1132(e)(2).

## FACTUAL ALLEGATIONS

13.  David Kritzell commenced his employment with Hutchinson in or around June 2009. David Kritzell was the Vice President of Sales and Marketing and worked out of Hutchinson's headquarters located at 460 Southard Street in Trenton, New Jersey.

14. During his employment, David Kritzell was responsible for growing Hutchinson's revenues year after year in the midst of an ever-changing defense budget, governmental and economic factors, and three CEO's (Defendant Andy Barker being the third).  Under David Kritzell's leadership, his business unit demonstrated exceptional growth each year, culminating in his business unit being the only unit with 10% growth in 2018.  In addition, his unit had in excess of $35 million in booked orders prior to the start of the 2019 calendar year.  This was an unprecedented accomplishment in the history of the business unit and a testament to David Kritzell's leadership, drive for excellence, and hand-picked sales team.  He was highly regarded in the company and likely in line for future advancement.  David Kritzell's base salary and bonus in 2018 was $210,000.

15.  During his tenure at Hutchinson under three different CEO's, David Kritzell never

4

received a negative performance review.

16.  In May of 2018, Andy Barker hosted the third annual Global Offsite Executive Leadership retreat in Costa Rica, termed "Velocity 2018," where Andy Barker praised David Kritzell's performance, describing him as an "insightful member of the team" and whose "contribution is of great value to the division."

17.  At the January 2019 Executive Monthly Staff Meeting, which was attended by all of Andy Barker's direct reports around the globe and David Kritzell's peers, Andy Barker reviewed everyone's 2018 performance.  Andy Barker singled David Kritzell out, stating, among other praises, that he and his team had an outstanding year with the agreements they reached with AM General and Oshkosh Corporation, and that his team far exceeded their budget projections and made up for shortfalls by other divisions in the company.

18.  In 1994, David Kritzell was diagnosed with Common Variable Immune Disorder ("CVID").  In simplest terms, David Kritzell was born without a functioning immune system, thereby limiting his ability to fight off infections and making him very susceptible to infections that would not affect an otherwise healthy person.  Since there is no cure for this disease, every four to six weeks, David Kritzell must undergo a four-hour treatment by means of an IV at his local hospital, under the care of his doctor and nurses.  Not having these treatments at the required times would put his life in jeopardy.

19.  Defendant Andy Barker was aware of, and acquiesced to, David Kritzell's medical treatment during work hours.  During the 4-hour treatments he received, David Kritzell would work on his laptop, reading and sending emails, and then would drive to work for the remainder of the day, so that very few co-workers (other than Andy Barker) had any knowledge of his illness.  Between CVID treatments, David Kritzell is required to take antibiotics at the first sign

of an infection, as well as over-the-counter pain killers just to get through the day at times. CVID has continual detrimental and irreversible effects on David Kritzell's critical organs and joints, making the impact on him worse over time.

20. During his tenure at Hutchinson, David Kritzell was required to travel extensively, both internationally and domestically. Notwithstanding his medical condition, with its burdensome treatment and debilitating side effects and prognosis, David Kritzell never cancelled a trip and never refused to schedule a trip due to his illness, many times to the potential detriment to his health. Without insurance, the cost of David Kritzell's medications is approximately $8,000 monthly.

21. As a federal government contractor, Hutchinson is required by federal regulations to have a satisfactory record of integrity and business ethics. Among other things, federal regulations require that government contractors must conduct themselves with the highest degree of integrity and honesty; that they have a written code of business ethics and conduct; and that they have employee training programs and an internal control system that facilitates timely discovery and disclosure of improper and unethical conduct in the workplace. As examples only:

    a.  Under 48 C.F.R. 3.1002(a), "[g]overnment contractors must conduct themselves with the highest degree of integrity and honesty."

    b.  Under 48 C.F.R. 3.1002(b):

      "[c]ontractors should have a written code of business ethics and conduct. To promote compliance with such code of business ethics and conduct, contractors should have an employee business ethics and compliance training program and an internal control system that —

(1) Are suitable to the size of the company and extent of its involvement in Government contracting;

(2) Facilitate timely discovery and disclosure of improper conduct in connection with Government contracts; and

(3) Ensure corrective measures are promptly instituted and carried out."

c.   Under 48 C.F.R. 9.104-1, "[t]o be determined responsible, a prospective contractor must—

. . .

(d) Have a satisfactory record of integrity and business ethics (for example, see subpart 42.15);

(e) Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them . . . ."

d.   Under 48 C.F.R. 9.104-2(b), "[c]ontracting officers shall award contracts for subsistence only to those prospective contractors that meet the general standards in 9.104-1 . . . ."

e.   Under 48 C.F.R. 9.104-3(a), "the contracting officer shall require acceptable evidence of the prospective contractor's ability to obtain required resources (see 9.104-1(a), (e), and (f)).  Acceptable evidence normally consists of a commitment or explicit arrangement, that will be in existence at the time of contract award, to rent, purchase, or otherwise acquire the needed facilities . . . ."

f.   Under 48 C.F.R. 9.104-6(a)(1), "[b]efore awarding a contract in excess of the simplified acquisition threshold, the contracting officer shall review the performance and integrity information available in the Federal Awardee

Performance and Integrity Information System (FAPIIS), (available at

www.ppirs.gov, then select FAPIIS), including FAPIIS information from the

System for Award Management (SAM) Exclusions and the Past Performance

Information Retrieval System (PPIRS) . . . ."

g.   Under 48 C.F.R. 9.104-6(c), "[i]f the contracting officer obtains relevant

information from FAPIIS regarding criminal, civil, or administrative proceedings

in connection with . . . determinations of nonresponsibility because the contractor

does not have . . . satisfactory record of integrity and business ethics . . . ," the

contracting officer may request further information "in order to demonstrate the

offeror's responsibility" and "[n]otify . . . the agency official responsible for

initiating debarment or suspension action, if the information appears appropriate

for the official's consideration."

22.   As an employee of Hutchinson, consistent with the above-referenced Federal

Acquisition Regulations and other relevant laws, David Kritzell was required to follow and

conduct himself in accordance with Total's Business Integrity Guide and Total's Code of

Conduct (together, "Hutchinson's Code of Conduct"), copies of which are annexed hereto as

**Exhibit A** and **Exhibit B**, respectively.  David Kritzell was required to sign a written

acknowledgement of the receipt of Hutchinson's Code of Conduct on December 11, 2018.

23.   Expressly mirroring 48 C.F.R. 3.1002, and clearly responsive to both 48 C.F.R. 3.1002

and the responsibility standards of 48 C.F.R. 9.104, Hutchinson's Code of Conduct dictates that

all employees must behave in an exemplary manner, rejecting all forms of internal and external

corruption, following the highest standards of integrity, keeping accurate records of the

company's expenditures and financial position, and avoiding wasting company resources.  Again

8

mirroring 48 C.F.R. 3.1002, Hutchinson's Code of Conduct sets forth the importance of "internal control," described as the process, carried out by the company's board of directors, management and other personnel, designed to provide reasonable assurance that: (1) transactions are effective, secure and efficient and allow the organization to achieve its basic goals, its performance and earnings targets and its objective of protecting assets; and (2) financial reporting is reliable.

24. Specifically, employees were instructed "[t]o strictly abide by all applicable legislation and regulation." (Exhibit B, at 26.) The company boasted that "[w]e comply with all applicable laws and regulations, especially concerning . . . employment," and that "[e]mployee relations with customers and suppliers should be fair and honest, in strict compliance with contractual undertakings and applicable laws and regulations." (Exhibit B, at 11, 15.) Employees were advised that Total is "accountable to: its shareholders, with the objective of striving to ensure a good return on their investment and providing them complete and transparent information on a regular basis"; and to "civil society" generally, as it "contributes to the social and economic development of the countries in which it operates, in compliance with local legislation and regulation." (Exhibit B, at 25.) Employees were also instructed on "maintain[ing] shareholder[] confidence," "harming the Group's image by giving inaccurate financial information to shareholders," and "encouraging a poor decision that is harmful to shareholders." (Exhibit A, at 36, 37.[1])

25. Hutchinson's Code of Conduct is replete with references to "fraud" and the "law," both national and international, essentially outlining the law and mandating that all Hutchinson employees comply with the laws set forth in Hutchinson's Code of Conduct. In a section titled

---

[1] References to "Exhibit A" page numbers herein refer to the page numbers inserted in the bottom right corner of each page of this exhibit.

"Rejecting fraud," Hutchinson's Code of Conduct even defines the legal standard for fraud, as follows: "Fraud is when you deliberately deceive people in order to secure unfair or unlawful gain or to avoid fulfilling a legal obligation.  Fraudulent behavior is not committed by accident and usually involves secretive and non-authorized actions.  The motive for fraud may be to obtain a material gain (appropriation of assets, financial gain or cost savings) or a moral incentive, for example, a sense of obligation, or the will to gain recognition or to protect a reputation.  In practice, fraud may result from either an action or an omission.  As a general rule, it is committed by forging documents and leads to the misappropriation or diversion of funds, to the misuse of equipment or to false information or accounting records.  The company may be a victim of fraud or benefit from it."  (Exhibit A, at 7.)

26.  Just as Hutchinson's Code of Conduct imported, incorporated, and was based upon the above-referenced federal regulations, its fraud policy was likewise based upon and responsive to various common law fraud and tort claims.  In fact, Hutchinson's Code of Conduct expressly referred to various laws and legal standards upon which its fraud, integrity, and anti-corruption policies are based.  For example:

    a.  In describing "The legal situation," Hutchinson represented to, and instructed, its employees that "All countries have laws banning the payment of bribes," and "[t]he laws of many countries also criminalize bribery and corruption in the private sector, i.e., between individuals, private companies, charities or professional bodies.  The penalties for bribery apply not only to the person or company that pays the bribe, but also to any accomplices."  (Exhibit A, at 5.)

    b.  In another section where Hutchinson purports to describe "[t]he legal situation," Hutchinson advises its employees that "[f]raud is always punished by law,

10

generally on the grounds of theft, obtaining cash, goods or services under false pretenses, misappropriation of funds, extortion, bribery, misuse of corporate assets, breach of trust, forgery and use of forged documents or concealment of evidence of income. **These offenses are punishable by a fine or a prison term.**" (Exhibit A, at 8 [emphasis in original].)

c.  In a section describing "Good salesmanship or corruption," employees were instructed that "[a] benefit granted or received with the aim of receiving a favor that breaches the law or your contractual or professional obligations is a bribe." (Exhibit A, at 6.)

d.  In a section titled "Our recommendations," Hutchinson stated that "[c]orruption destroys trust, which is the basis of the economy and community life. . . . We encourage all employees to seek transparency in our business dealings, through vigilance, awareness and a principled approach, and most of all through strict adherence to the rules set out in our Compliance Program and Policy (directive and related procedures)." (Exhibit A, at 6.)

e.  Hutchinson instructed its employees that "[f]raudulent practice, even if it is widespread, cannot be justified by reference to local cultural practices, necessity or actual or expected profits. If you have any doubts about a course of conduct, you should contact the Legal Department or the Internal Control and Audit Department. Under no circumstances should you take advantage of any loopholes in the law for material fraudulent gain." (Exhibit A, at 8.)

f.  Hutchison vociferously "[e]ncourage[d] honesty and healthy skepticsm," and, in an effort "to prevent fraudulent behavior," encouraged employees to "[h]ave the

11

courage to ask questions and seek advice." (Exhibit A, at 8.)

g.  In a section titled "Internal control," Hutchinson made clear that its express policies were "designed to provide reasonable assurance that . . . The applicable laws and regulations and the organization's guidelines are complied with." (Exhibit A, at 9.)

h.  In a section titled "Declaring conflicts of interest," Hutchinson defines a "conflict of interest" as "any situation in which an employee's personal interests could conflict with the interests of the company," and provided as examples "breaking the law, or adversely affecting the company's assets or reputation." (Exhibit A, at 9.)

i.  Hutchinson counsels its employees that "Loyalty (from the Latin word legalis, meaning in compliance with the law) is a core concept underpinning business relationships, and a proof of integrity and determination to fulfill commitments. In business relationships, the obligation of loyalty is embodied in legal principles such as the concept of *good faith*, which refers to behavior reflecting integrity and honesty, particularly in the execution of an obligation. Good faith is first and foremost *the absence of malicious intent*, but it also embodies *willingness and cooperation*." (Exhibit A, at 15 [emphasis in original].)

27.  Addressing its legal obligation to the public, Hutchinson's Code of Conduct contained a separate section dealing with "Shareholders" and "Investors." Among the many concerns about shareholders expressly set forth by Hutchinson were to make Hutchinson's "resources productive, create asset value and preserve the company's reputation"; to "[m]aintain shareholders' confidence and attract new investors"; and to "[a]void liability claims against

employees and the company." (Exhibit A, at 36.) Tracking its legal obligation to the public, Hutchinson touted its commitment to "keeping an accurate record of the Group's transactions and financial position," "regularly providing full and transparent information," and "providing equal access to information and remaining attentive to shareholder concerns." (Exhibit A, at 36.) Like Hutchinson's other policies that are based upon laws, its policies regarding shareholders expressly describe fraudulent conduct that would result in harm to shareholders. In fact, Hutchinson provided several examples of instances that would require its employees to "reject[]" fraud," such as:

    a.   An employee's knowledge of his manager's improper conduct, such as the manager improperly booking a sale in the wrong calendar year. According to Hutchinson, this improper conduct would give shareholders and investors "an inaccurate view of the company's results and financial position," it would "harm" the company's image "by giving inaccurate financial information to shareholders," it would "expos[e] the company and its management to legal risks under the regulations governing internal control of financial information," and it would "encourag[e] poor management and a lack of reporting discipline." In this type of situation, Hutchinson instructed its employees to "**object**" to this conduct as not compliant with the company's "accounting standards." (Exhibit A, at 37 [emphasis in original].)

    b.   "In connection with a company investment decision, your colleagues ask you to ignore recent unfavourable information about the project, despite the fact that this information changes your evaluation of the project." Hutchinson describes this type of conduct as a "deliberate omission of information" (i.e., fraudulent

13

omission or concealment) that "can lead to flawed operating decisions," which risks "encouraging a poor decision that is harmful to shareholders." (Exhibit A, at 38.)

28. In late 2016, David Kritzell was required to attend a training program on Hutchinson's "whistle-blowing" policies and procedures. Upon information and belief, this training was given as a direct result of the company's internal investigation into Hutchinson's sale of used products ("runflats") to the United States government as new, thereby committing possible fraud in excess of $1.5 million ("2016 runflat incident"). David Kritzell and other employees were told at the training session that this type of incident "should never happen again," and that they all must speak up in the future about possible unethical or fraudulent workplace conduct that could harm the company and/or its shareholders.

29. Hutchinson's "'Whistle-blowing' Procedure" ("Whistle-Blowing Procedure") was set forth in a comprehensive written manual that was made available to Hutchinson employees and, significantly, corresponds directly with Hutchinson's regulatory obligations under 48 C.F.R. 3.1002 and the responsibility standards of 48 C.F.R. 9.104. A copy of Hutchinson's "Whistle-Blowing Procedure" is attached hereto as **Exhibit C** and incorporated herein by reference. Like CEPA, Hutchinson's Whistle-Blowing Procedure expressly stated that Hutchinson "intends to ensure the employees' rights and to protect whistle-blowers." (Exhibit C, at 3.) In other words, in spirit and by its express terms, Hutchinson's Whistle Blowing Procedure is responsive to, and seeks to remedy, the very same illegal conduct addressed by CEPA.

30. In or around July 2018, and in accordance with the above-referenced federal regulations, David Kritzell was again required to attend a training program on Hutchinson's "whistle-blowing" policies and procedures. David Kritzell was told at the whistle-blower training

14

sessions that Hutchinson's "integrity policy" aims at "preventing any form of corruption," including both "internal and external fraud." (Exhibit C, at 3.) He was further taught that an "integrity incident" refers to "any behavior on the part of Hutchinson employees, suppliers or customers, which is non-compliant with [Hutchinson's] integrity policy" (described above), and in fact this written policy expressly referred to Total's Anti-corruption Compliance Directive, its Code of Conduct, and its Business Integrity Guide. (Exhibit C, at 3.)

31. Hutchinson's whistle-blower policy included the reporting not only of actual misconduct, but also "possible misconduct" regarding Hutchinson's "integrity policy," and applied to "[a]nyone who has knowledge of actual or alleged facts related to corruption, anti-competitive behavior, fraud or fraud attempt on the part of an individual or an entity within or outside Hutchinson and impacting the Group's interests." (Exhibit C, at 3-4.) David Kritzell was informed that employees who had knowledge of an integrity incident, and failed to report the same to the company's corporate integrity officer, could themselves be subject to dismissal. Finally, David Kritzell was told that each whistle-blowing report would be kept "strictly confidential" and that the whistle-blower's identity would not be revealed without his or her written agreement. (Exhibit C, at 3.)

32. Based on the foregoing, David Kritzell reasonably (and, although not required under CEPA, *correctly*) believed that Hutchinson's Code of Conduct and Whistle-Blowing Procedure were based upon, responsive to, and required by federal regulations and other federal and state laws in the United States. Hutchinson's Code of Conduct also expressly referred employees to the company's "Ethics Intranet," and cited various international laws, rules, regulations, and treaties, including: The 2003 United Nations Convention Against Corruption; The 2003 African Union Convention on Preventing and Combating Corruption; The 1999 Council of Europe Civil

15

Law and Criminal Law Conventions on Corruption; The 1997 OECD Convention on Combating
Bribery of Public Officials in International Business Transactions; The 1997 EU Convention on
the Fight Against Corruption Involving Officials of the European Communities or Officials of
the EU Member States; and The 1996 Inter-American Convention Against Corruption.  (Exhibit
A, at 7.)  Hutchinson's Code of Conduct also contains various explicit references to "national
and international laws," and civil and criminal sanctions, fines, and penalties, including prison,
administered as punishment for violating the company's policies regarding fraud, corruption, and
other illegal practices.

33. In the context of the above-referenced legal framework, which was communicated to
David Kritzell in various training sessions, meetings, and written company materials, in late
2017, Defendant Andy Barker created a small team to investigate a "refresh" of Hutchinson's
460 Southard Street offices in Trenton, New Jersey.  In early 2018, Andy Barker decided to
move forward with the project with an estimated price of approximately $1.2 million to $1.5
million.  In mid-2018, David Kritzell's group was relocated to the Perry Street offices, also
located in Trenton, New Jersey, while the office renovations were being conducted.  On
information and belief, the renovations were scheduled to be completed in early March 2019.

34.  Hutchinson leased the Southard Street building from Faigle Realty & Development.
Although the landlord paid for a new roof, costing approximately $200,000, Hutchinson paid for
the renovations at a price of approximately $1.2 million to $1.5 million.  Upon information and
belief, Andy Barker intentionally misrepresented and/or concealed the true cost and scope of the
renovation work involved to his direct reports in France, describing the work as a "refresh"
rather than the comprehensive office renovation that actually occurred.  Also, upon information
and belief, Andy Barker concealed the actual cost of the renovation by breaking up the cost into

16

small payments (hidden) so that it would stay under Andy Barker's signing authority and either not require corporate approval or not be noticed by his supervisors.

35. David Kritzell knew that Hutchinson's general policy – like most companies – prohibited capital expenditures of this size for leased premises, because the lease improvements become the property of the landlord (as opposed to spending those funds on premises owned by Hutchinson, in which case the capital expenditures would inure to the benefit of Hutchinson and its shareholders, rather than the landlord).

36. David Kritzell reasonably determined that Andy Barker's intentional concealment of the build-out from Hutchinson's parent company and shareholders was consistent with the hallmarks of fraud outlined in Hutchinson's Code of Conduct, constituted a breach of the company's "internal control" process, and thus was both unethical and illegal conduct. David Kritzell also reasonably determined that the build out of the Southard Street offices was an integrity incident within the meaning of Hutchinson's Whistle-Blowing Procedure, as it involved fraud or attempted fraud on the company and its shareholders.

37. On Friday, January 25, 2019, acting in good faith and with an objectively reasonable belief that he was following company policy, the federal regulations, and other state, federal, and international laws upon which the company's policies were based, and recalling the admonition that this "should never happen again" arising from the 2016 runflat incident, David Kritzell sent an email to Philippe Olivier ("Mr. Olivier"), a Senior Executive Vice President of Hutchinson S.A., located in Paris, France. The email described the build out of the Southard Street offices (the "Integrity Incident"). A copy of this email is attached hereto as part of **Exhibit D** and incorporated herein by reference.

38. As explained in the email to Mr. Olivier, David Kritzell reasonably and objectively

believed that reporting the Integrity Incident was (a) the "right thing to do," and (b) required by
Hutchinson's Code of Conduct, which in turn, is required by federal regulations, among other
laws, rules and regulations.  (Exhibit D, at 1.)  In other words, as a high-level company
executive, David Kritzell knew that, as a defense contractor for the United States government
whose funds are derived from the public at large (*i.e.*, taxpayers), Hutchinson was legally
required to conduct itself in accordance with federal ethics, accounting, and other regulations.
David Kritzell also knew that Hutchinson is owned by a public company, and, therefore, is
accountable to its shareholders and the public.  In his email, David Kritzell further explained and
believed, "If I don't speak up, I become part of the problem."  (Exhibit D, at 1.)  David Kritzell
reasonably and objectively believed that: (i) he could lose his job if he did not report the Integrity
Incident; (ii) he could be exposed to potential accomplice liability, based upon Hutchinson's
express policies regarding accomplice liability and the laws upon which those policies were
based; and (iii) Andy Barker's conduct could trigger an investigation, suspension, debarment,
and/or a finding of non-responsibility with respect to Hutchinson's integrity and/or business
ethics under the above-referenced federal regulations, which could eviscerate Hutchinson's
government contracts and the majority of its revenue.

39.  Mr. Olivier responded via email on Monday, January 28, 2019.  Mr. Olivier
acknowledged David Kritzell's concerns regarding the legality of Andy Barker's conduct,
stating: "You must know that generally we don't use formal CAPEX (class A) for refurbishing
rented premises because we can't take out those items when leaving!"  (Exhibit D, at 1.)  Mr.
Olivier also assured David Kritzell that he would be asking questions about the build out
"without mentioning you [David Kritzell]," and that he would keep David Kritzell informed in
the coming weeks.  (Exhibit D, at 1.)  This was not, however, what actually transpired.

40.  On February 15, 2019 -- twenty-one (21) days after David Kritzell reported the Integrity

Incident, and only eighteen (18) days after Mr. Olivier's email acknowledging receipt of it --

David Kritzell was summoned to a "catch up" meeting with Andy Barker at Hutchinson's

Clinton, New Jersey offices.  The only individuals present at the meeting were Andy Barker and

Kathy Young, Hutchinson's Director of Human Resources.  At this meeting, David Kritzell was

informed that his employment had been terminated effective immediately.  When David Kritzell

asked why he was being terminated, he was told by Andy Barker, in an extremely hostile tone,

that he had the authority to fire David Kritzell at will and without explanation.

41.  David Kritzell was ordered to immediately surrender his office keys, leased car keys,

badge, American Express credit card, and cell phone.  Hutchinson's Employee Handbook for

Salaried Employees ("Employee Handbook") (on page 76), states that "[i]n the event of

termination, the employee will be escorted to obtain their personal belongings . . . ."  Consistent

with the Employee Handbook, David Kritzell requested that he be permitted to return to his

Trenton office to retrieve all of the personal items that he had accumulated after almost ten (10)

years with the company, but Andy Barker refused to allow David Kritzell to retrieve his personal

items.  (A copy of the Employee Handbook is attached hereto as **Exhibit E** and incorporated

herein by reference.)

42.  When David Kritzell protested that he, at the very least, needed his backpack, which

contained his CVID medication, Andy Barker directed Kathy Young to retrieve the backpack.

David Kritzell was then escorted out of the building by a very hostile Andy Barker.  After Kathy

Young returned with David Kritzell's backpack and medication, and while waiting for an Uber

to drive him home, David Kritzell was told by Kathy Young that she had just learned of the

termination.  She then said: "These things are never pleasant, you will have no problem finding a

new job, and the truth of the situation will come out in the end."  While Kathy Young was very
respectful during the ordeal, Defendant Andy Barker was very disrespectful, hostile and
arrogant, treating David Kritzell like a criminal.

43.   After a decade as a loyal, accomplished, executive-level employee, with an exemplary
personnel record, neither Kathy Young nor Andy Barker was able to articulate *any* reason for
David Kritzell's termination.  In fact, the *only* incident that explains David Kritzell's termination
is his reporting of the Integrity Incident immediately prior to Andy Barker's retaliatory
termination.  Upon information and belief, in violation of Hutchinson's Code of Conduct and
Whistle-Blowing Procedure, David Kritzell's report and identity was not kept confidential by
Mr. Olivier.  Instead, Hutchinson and Andy Barker retaliated against David Kritzell, terminating
him for following company policies -- policies which David Kritzell reasonably (and correctly)
believed were based upon federal regulations, and other state, federal and international laws,
rules and regulations -- and reporting the Integrity Incident.[2]  Defendants then engaged in the
additional, post-termination retaliatory conduct described below.

44.   Hutchinson's Employee Handbook expressly stated that the only information that can be
released about an employee is his or her dates of employment, last job title, and last wage
rate/salary.  (Exhibit E, at 10.)  The Employee Handbook further provided that, "[f]or a former
employee, we do not discuss the individual's work performance, reason for leaving, or any other
information that we consider to be confidential."  (Exhibit E, at 10.)  The handbook also
prohibits "[u]nlawful discrimination or harassment."  (Exhibit E, at 11.).

45.   Following his termination, David Kritzell secured a job interview with ArmorWorks, a

---

[2] Upon information and belief, in April 2019, Hutchinson S.A. sent a third-party auditor to Hutchinson's Trenton
offices to investigate the circumstances surrounding the Integrity Incident.

defense and security company located in Arizona, for the position of Vice President of Sales/Marketing/Business Development at a base salary of $235,000, plus a projected bonus of $80,000.  After a rigorous screening process and several interviews, during the final stages of interviewing for this position in early March 2019, David Kritzell was notified, through a retained search firm, that ArmorWorks was checking references with a AM General, a company that was a customer of both ArmorWorks and Hutchinson in the small and tightly-knit industry of defense contractors.  David Kritzell's employment negotiations with ArmorWorks ended abruptly after AM General was visited by "the CEO of Hutchinson," who indicated that David Kritzell was terminated from Hutchinson "due to an ethical situation" and that David Kritzell was "hands-off."  As a direct result of these statements, ArmorWorks withdrew its consideration of David Kritzell's employment.  Upon information and belief, the "CEO of Hutchinson" is and was Andy Barker.

46.  Since David Kritzell's termination from Hutchinson and damage to his professional reputation, he has been forced to seek employment outside the defense contractor industry, where he has spent more than fifteen (15) years building his reputation, network, skills, and experience.  Because the defense contractor industry is a small, closely-knit community of companies and executives, Andy Barker's defamatory statements to AM General, which were then passed on to ArmorWorks: (a) forced David Kritzell to explore employment opportunities outside his area of expertise at significantly reduced compensation, job title, and benefits; and (b) permanently prevented David Kritzell from returning to the defense contractor industry, thereby significantly reducing his income potential for the remainder of his career.

47.  Not satisfied with their retaliatory termination of David Kritzell and destroying his reputation in the defense contractor industry, Defendants Andy Barker and Hutchinson – with

full knowledge of David Kritzell's documented medical condition, CVID -- next ensured that David Kritzell and his family suffered further economic, emotional, and, potentially, physical harm by failing to properly report David Kritzell's termination to the appropriate human resources personnel and/or third-party administrator of health benefits tasked with sending out COBRA notices.  As a result, and as described in greater detail below, David Kritzell was not notified of his right to elect the continuation of his health insurance coverage under COBRA, and his health insurance was dropped.

48.  Upon information and belief, Defendant Hutchinson is the Plan Sponsor, Plan Administrator and Fiduciary of the Hutchinson Industries, Inc. Employee Health Care Plan ("Plan"), an employer-sponsored welfare benefit plan governed by ERISA.

49.  At the time of his termination on February 15, 2019, David Kritzell was a participant in the Plan.  David Kritzell had elected family coverage for his spouse, Cindy Kritzell, and his minor son, A.K.

50.  David Kritzell planned to elect continuation of his family's health insurance coverage through COBRA as soon as he received the required notification.  When no COBRA notification was forthcoming, David Kritzell reasonably believed that his family's health insurance was being continued for the time being.  The continuation of David Kritzell's health insurance was of critical importance, as his CVID medications cost approximately $8,000 per month, and David Kritzell's health insurance also covered his wife and son.

51.  On Sunday, June 23, 2019, A.K. was injured and taken to the Emergency Room at Doylestown Hospital.  The following day (Monday), Plaintiffs were informed by the hospital's billing department that their health insurance coverage had been terminated effective February 28, 2019 and that they had no health insurance coverage.

52. Immediately after receiving information regarding the termination of his insurance coverage, David Kritzell, through his attorneys, informed Hutchinson that the Plaintiffs' insurance had been terminated and that Plaintiffs never received the statutorily-mandated COBRA notice.

53. After several communications with Hutchinson's counsel, on or about July 10, 2019, Plaintiffs finally received the COBRA coverage election notice, nearly five (5) months after David Kritzell's termination.

54. Upon information and belief, Andy Barker and Hutchinson intentionally failed to notify the Plan Administrator of David Kritzell's termination in order to further harm David Kritzell and his family, essentially seeking to "get back" at David Kritzell for whistle-blowing the Integrity Incident.  In other words, the failure to report David Kritzell's termination was not only a clear ERISA violation (as discussed below), it was (a) further retaliation above and beyond the termination of David Kritzell's employment, and (b) an additional violation of Hutchinson's Employee Handbook, which set forth the company's legal obligation to notify the Plan Administrator of a qualifying event. (See Exhibit E, at 29.)

55. As a result of the foregoing, Defendants' actions caused Cindy Kritzell to suffer extreme emotional distress and a resurgence of panic attacks that had been under control since 2009, resulting from concerns over whether her husband would be able to afford and receive his required CVID medications, and whether she and her son had adequate medical coverage. Plaintiffs may have unreimbursed medical expenses as a result of the lapse in their insurance coverage.

## **FIRST COUNT**

### **(Violation of COBRA's Notice Requirements)**

56.  Plaintiffs reassert and reallege each and every previous paragraph as if fully set forth and reiterated herein.

57.  ERISA requires that a proper COBRA election notice be sent to each qualified beneficiary within forty-four (44) days of a qualifying event, i.e., termination of employment, 29 U.S.C. § 1166.

58.  A qualified beneficiary includes the spouse and the dependent child of the covered employee, 29 U.S.C. § 1167(3)(A).

59.  Any employer failing to timely provide a COBRA notice to the qualified beneficiaries is subject to a fine of up to $110 per day, 29 U.S.C. § 1132(c)(1).  The penalty assessed pursuant to ERISA Section 502(c)(1)(A) begins upon the expiration of the 44-day period and ends upon delivery of a proper COBRA election notice.

60.  Plaintiffs experienced a COBRA qualifying event on February 15, 2019.  They should have received COBRA election notices by April 1, 2019.  They did not receive COBRA election notices until July 10, 2019 -- 101 days late.

61.  ERISA provides that each violation with respect to any single participant shall be treated as a separate violation, 29 U.S.C. § 1132(c)(1)(A).

62.  Defendant Hutchinson violated ERISA by failing to provide Plaintiffs timely COBRA election notices.  The COBRA election notices were delivered 101 days beyond the statutory deadline.

63.  The foregoing actions were knowing, willful and deliberate violations of law and deprivations of Plaintiffs' statutory rights and in retaliation for Plaintiff's report of the Integrity Incident.

64. Each Plaintiff is entitled to the maximum statutory penalties under ERISA in the amount

of \$110 per day for 101 days, an amount totaling \$33,330.00, plus an award of reasonable attorney's fees and costs of this lawsuit.

## **SECOND COUNT**

### **(Violation of the Conscientious Employee Protection Act)**

65.  Plaintiffs reassert and reallege each and every previous paragraph as if fully set forth and reiterated herein.

66.  David Kritzell engaged in "whistle-blowing" activities protected by CEPA, including but not limited to N.J.S.A. § 34:19-3(a), in that he disclosed to Philippe Olivier that Andy Barker had engaged in conduct which David Kritzell reasonably believed:

a.   violated the federal laws, rules, and regulations cited herein, among others, including violations involving deception and misrepresentation to shareholders and investors;

b.  was fraudulent or criminal, including Andy Barker's conduct, which David Kritzell reasonably believed may defraud shareholders and investors;

c.  breached the company's "internal control" processes, which were based upon the above-referenced federal laws, rules, and regulations, among others, thereby constituting unethical and illegal conduct that (i) violated of Hutchinson's Code of Conduct and Whistle-Blowing Procedure, which themselves were based upon, and required by, federal regulations, and (ii) involved deception, misrepresentation, or fraud affecting Hutchinson investors, shareholders and, ultimately, its customers, including an agency of the federal government, to wit, the United States Defense Logistics Agency.

67.  David Kritzell also engaged in protected whistle-blowing activity under N.J.S.A. §

34:19-3(c), in that David Kritzell objected to Andy Barker's conduct, which David Kritzell reasonably believed was incompatible with public policy.  Specifically, Andy Barker's conduct affected shareholders of a public company, as well as United States taxpayers whose money funded the defense contracts entered into between Hutchinson and the U.S. government.

68.  In retaliation for his whistle-blowing activities, David Kritzell suffered the severest form of adverse employment action, i.e., termination as well as other post-termination retaliatory acts by Defendants, as outlined above.

69.  Defendants' adverse employment action against David Kritzell was without any legitimate or lawful purpose.  Any purported rationale for Defendants' adverse employment action is and was pre-textual and is and was advanced in order to mask Defendants' retaliatory intent.

70.  Defendants' retaliatory actions against David Kritzell constitute violations of CEPA, N.J.S.A. 34:19-1, *et seq.*

71.  As a result, David Kritzell's statutory rights have been violated and his protections under the law have been eviscerated.

72.  As a direct and proximate result of Defendants' conduct, David Kritzell has suffered and will continue in the future to suffer loss of compensation and fringe benefits, consequential and incidental damages, and is incurring legal and other expenses.

73.  The foregoing actions were knowing, willful and deliberate violations of law and deprivations of David Kritzell's statutory and civil rights, and David Kritzell is entitled to punitive damages as permitted by law.

## **THIRD COUNT**

### **(Breach of Contract)**

26

74. Plaintiffs reassert and reallege each and every previous paragraph as if fully set forth and reiterated herein.

75. David Kritzell was required to read, acknowledge receipt of, and follow Hutchinson's Code of Conduct, Whistle-Blowing Procedure and Employee Handbook.  Hutchinson's Code of Conduct, Whistle-Blowing Procedure and Employee Handbook, thus became mutually-binding agreements to which both David Kritzell and all Hutchinson employees, executives and personnel were bound ("Agreements").

76. Hutchinson breached the Agreements by:

    a.  terminating David Kritzell for reporting the Integrity Incident as required by Hutchinson's Code of Conduct and Whistle-Blowing Procedure; and

    b.  failing to maintain strict confidentiality with respect to David Kritzell's whistle-blowing of the Integrity Incident.

77. Defendants committed several additional, independent breaches of the Agreements by:

    a.  releasing information about David Kritzell other than the dates of his employment, last job title, and last wage rate/salary;

    b.  discussing with AM General, knowing it would be passed along to ArmorWorks, David Kritzell's "work performance, reason for leaving," and other information that Hutchinson and Barker knew "to be confidential";

    c.  permitting Andy Barker's "[u]nlawful discrimination or harassment" against David Kritzell;

    d.  failing to notify the Plan Administrator that a qualifying event had occurred, thereby failing to trigger a timely COBRA notice; and

    e.  failing to escort David Kritzell to his office to obtain his personal belongings, and

27

in fact providing his necessary medications only upon David Kritzell's

protestations and insistence.

78.  David Kritzell has been damaged by Hutchinson's breach of the Agreements in an

amount to be proven at trial.

## FOURTH COUNT

### (Breach of the Covenant of Good Faith and Fair Dealing)

79.  Plaintiffs reassert and reallege each and every previous paragraph as if fully set forth and

reiterated herein.

80.  David Kritzell was required to read, acknowledge receipt of, and follow Hutchinson's

Code of Conduct and Whistle-Blowing Procedure, as well as Hutchinson's Employee Handbook.

Hutchinson's Code of Conduct, Whistle-Blowing Procedure, and Employee Handbook, thus

became mutually-binding agreements to which both David Kritzell and all Hutchinson

employees, executives and personnel were bound.  In the State of New Jersey, all such

agreements carry with them an implied covenant of good faith and fair dealing.

81.  By terminating David Kritzell for reporting the Integrity Incident as required by

Hutchinson's Code of Conduct and Whistle-Blowing Procedure and by failing to maintain strict

confidentiality with respect to David Kritzell's whistle-blowing of the Integrity Incident,

Hutchinson acted in extreme bad faith and in breach of the implied covenant of good faith and

fair dealing contained in Hutchinson's Code of Conduct and Whistle-Blowing Procedure.

82.  Defendants also breached the implied covenant of good faith and fair dealing contained

in Hutchinson's Employee Handbook by:

     a.   releasing information about David Kritzell other than the dates of his

          employment, last job title, and last wage rate/salary;

28

b. discussing with AM General, knowing it would be passed along to ArmorWorks, David Kritzell's "work performance, reason for leaving," and other information that Hutchinson and Andy Barker knew "to be confidential";

c. permitting Andy Barker's "[u]nlawful discrimination or harassment" of David Kritzell;

d. failing to notify the Plan Administrator that a qualifying event had occurred, thereby failing to trigger a timely COBRA notice; and

e. failing to escort David Kritzell to his office to obtain his personal belongings, and in fact providing his necessary medications only upon David Kritzell's protestations and insistence.

## FIFTH COUNT

### (Defamation)

83.  Plaintiffs reassert and reallege each and every previous paragraph as if fully set forth and reiterated herein.

84.  Defendant Andy Barker, acting at all times as the CEO and President on behalf of Hutchinson, and in the course and scope of his duties as CEO and President of Hutchinson, made false statements about David Kritzell, which mischaracterized the reason for his termination at Hutchinson and maligned his reputation, ethics and professional character. Upon information and belief, Defendant Andy Barker stated that David Kritzell was terminated from Hutchinson "due to an ethical situation" and that David Kritzell was "hands-off."

85.  Defendant Andy Barker communicated these false statements to one or more third parties, including AM General executives and/or employees, knowing that AM General at all times intended to pass these statements along to ArmorWorks.

29

86. Defendant Andy Barker's false statements about David Kritzell do not fall under any legal privilege.

87.  Defendant Andy Barker's false statements were injurious to David Kritzell's reputation permanently, and had the intended effect of subjecting him to the loss of at least one lucrative position at a prospective employer.

88.  David Kritzell has been damaged as a direct and proximate result of these defamatory statements in an amount to be proven at trial.

89.  Defendant Andy Barker acted maliciously, and solely in retaliation against David Kritzell for reporting the Integrity Incident to Mr. Olivier, and should be directed to pay punitive damages to David Kritzell.

90.  Defendant Andy Barker made these false and malicious statements while he was acting as the CEO and President on behalf of Defendant Hutchinson and in the course and scope of his duties for Defendant Hutchinson.  Thus, Defendant Hutchinson is liable for this tortious conduct under the doctrine of respondeat superior, and Defendants are jointly and severally liable.

## SIXTH COUNT

### (Tortious Interference With Prospective Economic Advantage)

91.  Plaintiffs reassert and reallege each and every previous paragraph as if fully set forth and reiterated herein.

92.  Defendant Andy Barker, acting at all times as the CEO and President on behalf of Hutchinson and in the course of his duties as CEO of Hutchinson, made false statements about David Kritzell, which mischaracterized the reason for his termination at Hutchinson and maligned his ethics and professional character.

93.  Defendant Andy Barker communicated the false statements to one or more third parties,

including AM General employees and/or executives, knowing that AM General at all times intended to pass these statements along to ArmorWorks.

94.  Defendant Andy Barker's false statements were injurious to David Kritzell's reputation permanently, and had the effect of subjecting him to the loss of at least one lucrative position at a prospective employer.

95.  David Kritzell has been damaged as a direct and proximate result of Andy Barker's tortious interference in an amount to be proven at trial.

96. Defendant Andy Barker acted maliciously, and solely in retaliation against David Kritzell for reporting the Integrity Incident to Mr. Olivier, and should be directed to pay punitive damages to David Kritzell.

97.  Defendant Andy Barker made these false and malicious statements while he was acting as the CEO and on behalf of Defendant Hutchinson and in the course and scope of his duties for Defendant Hutchinson.  Thus, Defendant Hutchinson is liable for Andy Barker's tortious conduct under the doctrine of respondeat superior, and Defendants are jointly and severally liable.

<u>**SEVENTH COUNT**</u>

**(Intentional Infliction of Emotional Distress)**

98.  Plaintiffs reassert and reallege each and every previous paragraph as if fully set forth and reiterated herein.

99.  Defendants' post-termination retaliatory conduct against Plaintiff David Kritzell and Plaintiff Cindy Kritzell -- i.e., Andy Barker's defamatory statements in connection with David Kritzell's prospective employment at ArmorWorks, and Hutchinson's failure to provide Plaintiffs with timely COBRA notices and the resulting lapse in Plaintiffs' medical insurance coverage -- was malicious, willful, wanton, reckless, and in deliberate violation of Plaintiffs'

civil rights, and which was intended to, and did in fact, cause Plaintiff Cindy Kritzell to suffer extreme emotional distress, including but not limited to, a resurgence of panic attacks that had been under control since 2009.

100.     Defendants' conduct was outrageous and exceeded all bounds normally tolerated in our society.

101.     As a direct and proximate result of Defendants' egregious conduct, Plaintiff Cindy Kritzell was exposed to and suffered the intentional infliction of emotional distress, and she has sustained both economic and emotional damages.

## EIGHTH COUNT

### (Negligent Infliction of Emotional Distress)

102.     Plaintiffs reassert and reallege each and every previous paragraph as if fully set forth and reiterated herein.

103.     Defendants Andy Barker and Hutchinson owed a duty of reasonable care to David Kritzell and Cindy Kritzell to: (i) keep David Kritzell's report of the Integrity Incident "strictly confidential" and not reveal David Kritzell's identity without his written agreement; (ii) refrain, after his unlawful and unjust termination, from divulging information about David Kritzell other than the dates of his employment, last job title, and last wage rate/salary; (iii) notify the Hutchinson Plan Administrator that a qualifying event had occurred, thereby triggering a timely COBRA notice to the Plaintiffs; and (iv) after his unlawful and unjust termination, escort David Kritzell to obtain his personal belongings without objection or restriction of any kind, especially given his disclosed medical condition.

104.     Defendants Andy Barker and Hutchinson breached their duty of care by their pre- and post-termination retaliatory conduct against Plaintiffs David and Cindy Kritzell by: failing to

keep David Kritzell's report of the Integrity Incident "strictly confidential" and revealing his identity without his written agreement; Andy Barker's defamatory statements in connection with David Kritzell's prospective employment at ArmorWorks; Hutchinson's failure to provide Plaintiffs with a timely COBRA notice and the resulting lapse in Plaintiffs' medical insurance coverage; and refusing to escort David Kritzell to obtain his personal belongings, and in fact, providing his necessary medications only upon David Kritzell's protestations and insistence.

105.    Defendants' negligent conduct caused Plaintiff Cindy Kritzell to suffer extreme emotional distress, including but not limited to, a resurgence of panic attacks that had been under control since 2009.

106.     Defendants' conduct was outrageous and exceeded all bounds normally tolerated in our society.

107.     As a direct and proximate result of Defendants' egregious conduct, Plaintiff Cindy Kritzell was exposed to and suffered the negligent infliction of emotional distress, and she has sustained both economic and emotional damages.

**WHEREFORE** Plaintiffs demand judgment against the Defendants as follows:

a. On the First Count, Plaintiffs demand judgment against Defendant Hutchinson as follows: (1) civil fines in the amount of $110.00 per day for each Plaintiff from April 1, 2019 to July 10, 2019 in the amount of $33,330.00; and (2) an award of reasonable attorneys' fees and costs of this lawsuit;

b. on the Second Count, Plaintiff David Kritzell demands judgment against Defendants as follows: (1) an award of compensatory damages for economic damages suffered as a direct result of Defendants' actions in an amount to be proven at trial; (2) civil fines as permitted by law; (3) an award of punitive damages as permitted by law; (4) an award of reasonable attorneys' fees and costs of this lawsuit;

c. on the Third and Fourth Counts, Plaintiff David Kritzell demands judgment against Defendant Hutchinson as follows: an award of compensatory damages suffered as a result of its breach of the Agreement and breach of the implied covenant of good faith and fair dealing;

d.  on the Fifth and Sixth Counts, Plaintiff David Kritzell demands judgment against Defendants, jointly and severally, as follows: (1) an award of compensatory damages for economic damages suffered as a direct result of Defendants' defamatory statements in an amount to be proven at trial; (2) an award of punitive damages against Defendants to be determined at trial, and in order that such award will deter similar proscribed conduct by Defendants in the future; and (3) a permanent injunction preventing Defendants from making false, misleading, or defamatory statements about David Kritzell and/or from disclosing any information about his employment at Hutchinson and/or termination other than dates of employment, last job title, and last wage rate/salary;

e.  on the Seventh and Eighth Counts, Plaintiff Cindy Kritzell demands judgment against Defendants as follows: (1) an award of compensatory damages for economic damages suffered as a direct result of Defendants' tortious conduct; and (2) an award of compensatory damages for emotional damages suffered as a direct result of Defendants' tortious conduct; and

g.  any such other and further relief that the Court deems just and equitable.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues involved herein.

## CERTIFICATIONS PURSUANT TO RULE 11 AND LOCAL RULE 11.2

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Pursuant to Local Civil Rule 11.2, I hereby certify that, to the best of my knowledge and belief, the matter in controversy is not the subject of any other action pending in any other court

or a pending arbitration proceeding.  Also, to the best of my knowledge and belief, no other action or arbitration proceeding is contemplated.

Dated: December 10, 2019

**KIAM & ABRAHAM, LLC**

By:    s/ Daniel S. Abraham

Kiam & Abraham, LLC
88 Bartley-Flanders Road, Suite 108
Flanders, NJ 07836
(973) 975-4842 (tel)
(973) 387-0340 (fax)
dan@kiamlaw.com

*Attorney for Plaintiffs*

## EXHIBIT LIST

Exhibit A –   Total's Business Integrity Guide

Exhibit B –   Total's Code of Conduct

Exhibit C –   Hutchinson's Whistle-Blowing Procedure

Exhibit D –   David Kritzell's January 25, 2019 Email to Philippe Olivier and Philippe Olivier's
              January 28, 2019 Email in Response

Exhibit E –   Hutchinson's Employee Handbook For Salaried Employees